NOTICE
Decision filed 02/23/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 200322

NO. 5-20-0322

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Massac County. |
| | ) | |
| v. | ) | No. 04-CF-85 |
| | ) | |
| JUDAH J. WATKINS, | ) | Honorable |
| | ) | Joseph M. Leberman, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court, with opinion.
Presiding Justice Boie and Justice Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant appeals from his 46-year sentence, arguing that the sentence amounts to an unconstitutional *de facto* life sentence. He asks this court to reverse and remand this case to the trial court for resentencing. The defendant contends that the sentence is in violation of the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and alleges that the trial court failed to consider all *Miller v. Alabama*, 567 U.S. 460 (2012), factors necessary to impose a life sentence on a juvenile. He also contends that the sentence is in violation of the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), and he alleges that the trial court failed to properly consider the seriousness of the offense and the defendant's rehabilitative potential. We affirm the sentence.

1

¶ 2                                I. BACKGROUND

¶ 3     On May 26, 2004, the State charged the defendant with six counts of first degree murder,[1] home invasion (720 ILCS 5/12-11(a)(5) (West 2002)), aggravated battery with a firearm (*id.* § 12-4.2(a)(1)), armed robbery (*id.* § 18-2(a)(2)), and residential burglary (*id.* § 19-3(a)).

¶ 4     The background facts of the underlying crime and the State's evidence are important for a thorough analysis of the trial court's handling of this case on remand for resentencing. The facts contained in this opinion have been partially extracted from this court's order affirming the trial court's denial of the defendant's petition for postconviction relief. *People v. Watkins*, 403 Ill. App. 3d 1121 (2010) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 5     On May 26, 2004, at approximately 2:30 a.m., Deputy Ronald Traversy of the Massac County Sheriff's Department was dispatched to Wes Edwards's trailer in rural Massac County in response to a report of "a burglary and possible shooting." Upon his arrival, after seeing that the trailer's front door had been kicked in, Traversy announced his presence and entered. Once inside, he observed a Ruger Mini-14 rifle with "blood all over it" lying on the kitchen table and "a black cordless phone that had bloody handprints on it." Edwards's voice led Traversy down the trailer's hallway to the master bedroom, where Traversy found Edwards and Edwards's girlfriend, Andrea Perdew.

---

[1] Two counts of first degree murder were pursuant to section 9-1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(1) (West 2002)—(1) in a calculated and premeditated manner pursuant to a preconceived design to take a human life by unlawful means, the defendant shot Andrea J. Perdew in the head at close range with a gun, thereby causing her death, and (2) the defendant shot Perdew in the head with a gun knowing said act would cause, and did cause, her death). The third count was charged pursuant to section 9-1(a)(2) of the Code (*id.* § 9-1(a)(2))—the defendant shot Perdew in the head with a gun knowing such act created a strong probability of, and causing, her death. The fourth, fifth, and sixth counts were pursuant to section 9-1(a)(3) of the Code (*id.* § 9-1(a)(3))—the defendant shot Perdew in the head with a gun and caused her death while committing a forcible felony, home invasion (*id.* § 12-11(a)(2)), armed robbery (*id.* § 18-2(a)(2)), and residential burglary (*id.* § 19-3(a)).

¶ 6    Edwards was at the foot of his bed with a strip of grey duct tape wrapped around his left wrist. He was bleeding from numerous head lacerations, and several of his teeth had been "knocked out." He had also been shot once in the right wrist and once in the right leg above the knee. A bullet had also grazed Edwards's stomach. Perdew was lying dead on the bed in a pool of blood. She had been shot once in the left side of her chest, once in the left side of her abdomen, and once in the left side of her head through her ear. Gunpowder stippling observed on Perdew's left ear indicated that she had been shot in the head from "no further away than 18 inches."

¶ 7    Paramedics responding to the scene observed a crashed and abandoned white Chrysler New Yorker in a field approximately two miles from Edwards's trailer. An ensuing investigation led to the arrests of the defendant, Sharod Roundtree, and the defendant's cousin, Joel Nelson. Nelson was the owner of the abandoned vehicle. The defendant was walking down the street in his hometown of Pulaski on the afternoon of May 26, 2004, when he was arrested and brought in for questioning. The defendant later led investigators to a ditch in rural Massac County, where a black Lorcin 9-millimeter semiautomatic handgun was recovered. At the defendant's trial, Gary Randolph of Brookport indicated that he had sold the Lorcin to Nelson in 2003.

¶ 8    When Edwards's trailer was processed for evidence, a roll of duct tape with blood on it was recovered from the master bedroom. The bedroom appeared as if it had been "ransacked or searched," and drawers and cabinets throughout the trailer were found open. Blood was also visible at various locations throughout the trailer.

¶ 9    Four spent 9-millimeter shell casings were recovered from the floor along the wall nearest the bed in the master bedroom. One jacketed bullet was found on the bed underneath Perdew's body, another jacketed bullet was found underneath the bed, and a bullet jacket was found inside

3

Perdew's bloody pillow. During Perdew's autopsy, a jacketed bullet located near her right shoulder blade was recovered.

¶ 10    Ballistics testing revealed that one of the four shell casings found on the floor of Edwards's master bedroom had been ejected from the Lorcin and that the jacketed bullet found underneath the bed could have been fired from the Lorcin. The other two bullets, the bullet jacket, and the other three shell casings all came from "the same unknown firearm" and did not come from the Lorcin. Like the Lorcin, the "unknown firearm" was also a 9-millimeter weapon.

¶ 11    DNA testing revealed the presence of Edwards's blood on the driver's-side air bag of Nelson's crashed New Yorker. Edwards's blood was also found on a black tee shirt that was recovered from a trash can behind Leon Blye's house in Metropolis. Black fibers from the tee shirt were microscopically consistent with black fibers found on the New Yorker's passenger side air bag.

¶ 12    At the trial, Edwards testified that sometime around 2 a.m. on May 26, 2004, he awoke to find someone on top of him hitting him in the head with a handgun. He indicated that there were two black males present and that he could hear them talking back and forth. As both men repeatedly struck Edwards in the face, they asked him where his money was, but he "didn't know what they were talking about." Edwards testified that he struggled with the intruders while trying to protect Perdew. Edwards stated that he heard gunshots and realized that he had been shot in the arm. Edwards testified that, when Perdew did not answer him when he yelled at her and he could tell that she was not moving, he realized she was dead. When the men forced Edwards's arms behind his back and tried to bind them with duct tape, he "was able to turn around and start fighting." At one point, one of the men referred to the other as "Jonathan." The men eventually fled, and Edwards indicated that he was shot in the leg just "before they took off out of the room."

4

¶ 13    Edwards subsequently retrieved his Ruger Mini-14 rifle from his closet and "went to the front of the trailer to see if [he] could see headlights anywhere." He then grabbed the cordless phone from the kitchen so that he could call 911. Edwards recalled that, as soon as he picked up the phone, Joel Nelson was on the phone, apparently having called Edwards. Nelson told Edwards to call 911. Edwards could not remember whether he had actually called 911, but Deputy Traversy and the paramedics arrived shortly thereafter. Edwards advised Traversy that two men had attacked him. At the trial, Edwards indicated that he could not remember all the details of what had occurred, and he testified that one of the responding paramedics was amazed that he had not lost consciousness. Edwards later discovered that his wallet, his cell phone, and Perdew's cell phone were missing from the trailer.

¶ 14    Edwards testified that prior to May 26, 2004, he and Nelson had been friends, and Nelson had been to his trailer on several occasions. Edwards had met Roundtree a few times while "hanging out" with Nelson, but he did not know the defendant. Edwards indicated that Nelson had children with two different girlfriends, Katreeka Hardy and Christy McCormick.

¶ 15    Christy McCormick testified that on May 26, 2004, Nelson, Roundtree, and the defendant had stopped by her apartment in Metropolis at approximately 12:30 a.m. They were "dressed in black" and were "acting rowdy and loud." McCormick indicated that the defendant was armed with a black handgun, and he took a latex glove from a drawer in her kitchen. While Roundtree and the defendant waited downstairs, McCormick accompanied Nelson upstairs, where he retrieved a second black handgun, which he had previously stashed in her bedroom closet. McCormick testified that the three men were "talking of a robbery," but they did not say who they were going to rob or where it was going to occur. McCormick tried to talk them out of it but could only convince Nelson not to go. The defendant and Roundtree subsequently left in Nelson's New

Yorker, while Nelson stayed behind. McCormick indicated that the defendant had left her apartment with the handgun in his possession and Roundtree had left with the handgun that Nelson had retrieved from her closet. They also left with a green and blue diaper bag, which was later found in a wooded area a mile or so away from where the Lorcin handgun was recovered.

¶ 16    McCormick testified that around 2 a.m. Roundtree called Nelson from her apartment using Edwards's cell phone. Thereafter, Nelson called Edwards's trailer, and believing that Edwards was dying, Nelson "freaked out" and drove McCormick's car to Katreeka Hardy's house, where he had Hardy call 911. He then returned to McCormick's apartment. Around 3 a.m., McCormick dropped Nelson off at Hardy's house. Around 6 a.m., the defendant and Roundtree returned to McCormick's apartment, banging on the door and throwing rocks at her upstairs window. She did not respond, however, or acknowledge their presence.

¶ 17    Investigators Dean Hamilton and Chad Brown of the Illinois State Police testified that they had interviewed the defendant regarding the incident at Edwards's trailer multiple times following his arrest. When first questioned on the afternoon of May 26, 2004, the defendant denied being at Edwards's trailer with Roundtree and denied knowing anything about what had happened there. He did state, however, that on the night of May 25, 2004, he had been introduced to Roundtree while attending a party at Leon Blye's house. The defendant further stated that he had never met Roundtree before but had heard of him and knew that he and Nelson were friends. According to the investigators, when confronted with the possibility that someone might have seen him at Edwards's trailer when Perdew was murdered, the defendant stated something to the effect of, "If somebody said I was there, then I was there; if somebody said I was not there, then I was not there." The investigators related that the defendant also contended that "no one [could] prove nothing" on him.

6

¶ 18    On the evening of May 26, 2004, investigators Hamilton and Brown spoke with the defendant again at his request. During this second interview, the defendant indicated that he had accompanied Roundtree to Edwards's trailer on the morning in question, intending to purchase some marijuana. The investigators stated that the defendant claimed that he "didn't know anything else was going to happen." He stated that Roundtree had driven Nelson's New Yorker to the trailer and had parked down the road instead of in the driveway. The defendant and Roundtree knocked on the front door of the trailer, but no one answered. Roundtree then walked around the trailer, knocking on windows "to see if anyone would wake up." The investigators stated that the defendant said that, when Roundtree returned to the front door, he kicked it in and that he and the defendant ran inside. Upon entering Edwards's trailer, Roundtree "pulled a gun out of the waistline of his pants" and immediately ran to the master bedroom. The defendant claimed that he did not have a handgun and that the only weapon was the one that Roundtree had. In the bedroom, Roundtree yelled at Edwards and Perdew, demanding that they tell him where their money and marijuana was located. Roundtree and Edwards struggled, gunshots rang out, and Perdew stopped screaming. Roundtree then laid the handgun down and tried to bind Edwards's hands with duct tape. Edwards continued to fight, and Roundtree repeatedly struck him in the head with the handgun. Roundtree grabbed two cell phones off a table in the bedroom, and he and the defendant ran out of the trailer and back to Nelson's car.

¶ 19    The defendant told investigators Hamilton and Brown that, while speeding away from the scene, Roundtree lost control of Nelson's car and crashed it at an intersection. The defendant and Roundtree subsequently walked through fields back to Metropolis. The defendant indicated that Roundtree had used the stolen cell phones to place calls while they were walking back to town. The defendant thought that Roundtree had called Nelson, but he was not sure. When they arrived

7

back in Metropolis, they went to McCormick's apartment, but no one would answer the door, so they went to Blye's house. Blye later gave the defendant a ride home. The defendant advised that he had worn a black tee shirt to Edwards's trailer and Roundtree had not worn a shirt at all. The investigators testified that the defendant indicated that Roundtree had "blood all over his hands" when they left the trailer and that the defendant "thought maybe some of the blood that was on [Roundtree] might have gotten on him when they bumped into each other when they were running together." The defendant further indicated that he had changed his clothes at Blye's house. The defendant advised Hamilton and Brown that, when they first questioned him, he did not tell them what had happened because he was scared and Roundtree had told him to not say anything.

¶ 20 On the morning of May 27, 2004, investigators Hamilton and Brown interviewed the defendant for a third time. Since the second interview, Roundtree had made statements incriminating the defendant, and Hamilton and Brown wanted "to clarify some things." In the third interview, having previously denied being at McCormick's apartment before going to Edwards's trailer, the defendant explained that he, Roundtree, and Nelson had gone there after leaving Blye's party. The investigators testified the defendant stated that at the apartment, while he had waited downstairs in the living room, McCormick, Roundtree, and Nelson had gone upstairs and "[h]e could hear them laughing and talking, but he couldn't make out what they were actually saying." When they came back down, Roundtree had a green and blue bag. The defendant and Roundtree then went to Edwards's trailer, and when they went inside, Roundtree brought the bag in with him.

¶ 21 On the afternoon of May 27, 2004, when the defendant was interviewed for a fourth and final time, he told investigators Hamilton and Brown that he could not believe that Nelson and Roundtree were blaming him for what had occurred at Edwards's trailer. He again denied having a handgun on the night in question, but he indicated that six to eight months prior, he had fired

8

Nelson's Lorcin handgun at a trash can behind Nelson's house. Two 9-millimeter shell casings were later found behind the house in the approximate location that the defendant had described. Ballistics testing revealed that the casings had come from the same unknown firearm that had ejected three of the four casings found in the master bedroom of Edwards's trailer and had not come from the Lorcin handgun. During the fourth interview, the defendant indicated that Roundtree had dropped the Lorcin handgun while they were walking back to town. The defendant volunteered to show the investigators where Roundtree had dropped the weapon, and he subsequently helped them find it.

¶ 22    Roundtree testified that on May 26, 2004, he, Nelson, and the defendant decided to go to Edwards's trailer and rob him of "[s]ome money or some drugs." They first went to McCormick's apartment, where they obtained a 9-millimeter handgun, a blue and green bag, and a roll of duct tape. McCormick convinced Nelson not to participate in the robbery, so Roundtree and the defendant went on without him. The defendant already had a 9-millimeter handgun of his own, so Roundtree took Nelson's handgun. Roundtree stated that he and Nelson were close friends but that he had only known the defendant for a couple of months.

¶ 23    Roundtree testified that he drove to Edwards's trailer in Nelson's New Yorker and parked up the road from the driveway. When he and the defendant approached the trailer and saw that only one vehicle was present, they thought that no one was there. After they walked around the outside of the trailer, the defendant kicked in the front door, and they entered. They were each armed with a handgun, and they had the bag and the duct tape with them. The defendant went to the master bedroom in the back of the trailer, and Roundtree subsequently heard gunshots. Roundtree then went to the bedroom and saw the defendant and Edwards struggling on the bed. Perdew was also on the bed, but she was not moving. Roundtree stated that he and the defendant

9

had beaten Edwards with their guns and that the defendant had "stayed on top of [Edwards] the whole time." Roundtree testified that he had tried to tape Edwards's hands together with the duct tape. At one point, the defendant called Roundtree by his name, but realizing what he had done, the defendant "changed it" and called him "Jonathan." The defendant told Roundtree to kill Edwards, but Roundtree only shot him in the leg to "slow him down." Roundtree took two cell phones from the bedroom before he and the defendant fled the trailer.

¶ 24 Roundtree testified that, as he and the defendant were speeding away from the scene, he crashed Nelson's car. He and the defendant then walked back to town and stopped by McCormick's apartment. Along the way, Roundtree dropped Nelson's handgun in a ditch and called him using the stolen cell phones. Roundtree turned himself in to the police later that morning. Roundtree testified that when he left the trailer, he might have had blood on his hands, but there was no blood on his chest. Roundtree testified that he had recently pled guilty to a charge of first degree murder in this case, and he acknowledged that he was "awaiting sentencing for [his] part in this crime."

¶ 25 The defendant testified that he had never discussed committing a robbery with Nelson and Roundtree but that he was with them at McCormick's apartment on May 26, 2004. While they were there, Nelson and McCormick had gone upstairs, and Roundtree had gone part of the way upstairs. The defendant testified that he could hear Nelson and McCormick talking and laughing upstairs, but he did not know what they were discussing. When Nelson came back downstairs, he told the defendant and Roundtree to come back and get him in an hour. The defendant subsequently accompanied Roundtree to Edwards's trailer, thinking that they were going to purchase some marijuana. The defendant did not know that Roundtree was planning to rob Edwards. The

defendant acknowledged that he was wearing a black tee shirt and that Roundtree was not wearing a shirt.

¶ 26    The defendant testified that, after arriving at Edwards's trailer in Nelson's car, Roundtree knocked on the front door. When no one answered, Roundtree walked around the trailer and then kicked in the front door. After the door opened, Roundtree pulled out a handgun and directed the defendant to enter. Once inside, Roundtree went to the master bedroom, and the defendant heard scuffling and gunshots. The defendant went to the bedroom and saw Roundtree hitting Edwards with a handgun, demanding to know where his money and drugs were. Perdew was lying motionless on the bed. Roundtree tried to tape Edwards's hands together with duct tape, and he grabbed two cell phones off a table as he left the room.

¶ 27    The defendant testified that Roundtree crashed Nelson's car while fleeing the scene. While walking back to Metropolis, Roundtree tried to call someone using the stolen cell phones and accidentally dropped the handgun that he had in a ditch. When they got back to town, they went to McCormick's apartment and then went to Blye's house. Roundtree told the defendant not to say anything about what had occurred at Edwards's trailer, and Blye later gave the defendant a ride home. The defendant was subsequently arrested and questioned about what had occurred. The defendant indicated that he had not initially told the investigators what he knew because he was afraid of what Roundtree might do to him. The defendant stated that he had later told the truth and had helped locate the handgun that Roundtree had dropped in the ditch.

¶ 28    The defendant testified that he did not have a handgun on the night in question and that he "only saw [Roundtree] pull one." When asked to explain why the ballistics evidence indicated that the recovered Lorcin had ejected only one of the four shell casings found in the bedroom and that

11

an unknown weapon had ejected the other three casings and the two casings found behind Nelson's house, the defendant stated, "Those shells could have came from anywhere."

¶ 29    On February 3, 2005, a Massac County jury found the defendant, Judah J. Watkins, guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2002)), home invasion (*id.* § 12-11), armed robbery (*id.* § 18-2(a)(2)), residential burglary (*id.* § 19-3(a)), and aggravated battery with a firearm (*id.* § 12-4.2(a)(1)) resulting from criminal acts he committed when he was 17 years old. On April 4, 2005, the trial court sentenced the defendant to serve concurrent sentences of 25 years for first degree murder, 15 years for home invasion, 15 years for armed robbery, and 15 years for aggravated battery with a firearm. Based upon a special interrogatory submitted to the jury, the trial court added an additional 25 years to the defendant's sentence of first degree murder because the jury determined that the defendant personally discharged the firearm that caused Perdew's death. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2002).

¶ 30    Following his conviction and sentence, the defendant filed a motion for a summary order with this court. In the motion, he asked for modification of the judgment to reflect that he served 314 days in presentence incarceration. In response, the State filed a confession of error. This court granted the motion and modified the trial court's judgment to reflect the 314 days' credit for time served against his prison sentences. *People v. Watkins*, 371 Ill. App. 3d 1232 (2007) (table) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 31    In September 2007, the defendant filed a postconviction petition alleging multiple claims of ineffective assistance of trial and appellate counsel and a claim of actual innocence. The trial court dismissed his ineffective assistance of counsel claims but scheduled a hearing on his actual innocence claim. After the hearing, the trial court denied the defendant's claim of actual innocence.

12

On appeal, this court affirmed. *Watkins*, 403 Ill. App. 3d 1121 (2010) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 32 On April 22, 2015, the defendant filed a *pro se* motion for leave to file a successive postconviction petition. The trial court denied the motion on June 17, 2015. He appealed to this court and argued that the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) prohibited criminal punishments so disproportionate as to be construed as cruel and unusual and, alternatively, that his 50-year sentence was prohibited because he committed the crimes as a juvenile and the sentencing scheme exceeded his natural life expectancy. This court found that a 50-year sentence imposed for a crime committed when the defendant was a juvenile constituted a *de facto* life sentence without parole. *People v. Watkins*, No. 5-15-0263 (2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)); *People v. Buffer*, 2019 IL 122327, ¶ 46. Thus, the defendant's sentence violated the eighth amendment unless the trial court first considered mitigating factors including the defendant's youth, immaturity, and potential for rehabilitation. *Buffer*, 2019 IL 122327, ¶ 46; *People v. Reyes*, 2016 IL 119271, ¶ 9; *People v. Holman*, 2017 IL 120655, ¶ 40. We vacated the sentence and remanded the case to the trial court for resentencing. *Watkins*, No. 5-15-0263.

¶ 33 On remand, the trial court held the sentencing hearing in 2020. The defendant called several witnesses, including an expert witness. At the conclusion of the hearing, the trial court stated that it had reviewed all exhibits presented, including a report prepared by expert witness and developmental psychologist Dr. James Garbarino, letters in support of the defendant, and the defendant's reentry plan. The exhibits included the defendant's records from the Illinois Department of Corrections (IDOC), which included educational records and certificates of completion of seminars and courses designed to provide redirection to his life. His IDOC

13

employment records indicated that those who reviewed his work found that his work as a tailor was highly skilled and consistently surpassed expectations. The defendant was also helpful in aiding the training of new offender workers. He had also been trained in other trades that could provide potential employment opportunities upon his release from IDOC. Other documents within the IDOC records included recognition of the defendant's volunteer efforts and donations to charitable causes. While incarcerated, the defendant obtained his high school equivalency certificate. Although he was ineligible for an award of credit against his sentence for participation in certain programs, nonetheless, the defendant continued to participate in offered programs.

¶ 34 Before sentencing the defendant, the trial court stated on the record that it had reviewed all exhibits, the presentence investigations, and addendums; considered the witness testimony and evidence presented at the hearing; reviewed portions of the trial and sentencing hearing transcripts; considered the defendant's statement, including his reentry plan; and considered all factors in aggravation and mitigation as well as the codified *Miller* factors.

¶ 35 The trial court specifically commented upon Dr. Garbarino's report, noting that, although the report was subjective, the court was cognizant that a juvenile's brain would not fully attain maturity until the age of 25. The trial court took issue with the report because it failed to consider the defendant's "higher functioning" in high school and failed to consider the circumstance of the offense and the role that the defendant played. The court also noted that there was no evidence that the defendant's mother was a drug addict, although Dr. Garbarino relied upon that "fact." The trial court noted discrepancies between the depiction of the defendant's childhood and home life in Dr. Garbarino's report as compared to the information compiled and included in the presentence investigation report and the testimony of the defendant's mother. The presentence investigation report indicated that there had been no Department of Children and Family Services involvement

14

and no history of abuse or neglect. The defendant's mother testified that there was always family around, that they participated in social events, and that the defendant was raised in a safe and nurturing environment.

¶ 36     The trial court noted that the defendant had taken advantage of numerous programs during his incarceration, had a stellar work history, and had 15 years with "basically no tickets." The court commented on the fact that correctional employees testified on the defendant's behalf and that a county jail correctional officer wrote a letter attesting to the defendant's exemplary behavior.

¶ 37     The trial court also considered the circumstances of the offense and the defendant's "degree of participation" in the crime. The court noted that, while there were two handguns used during the crimes, the defendant used one of the two guns and shot Perdew three times, which ended her life. The trial court noted that there was some evidence of a plan to commit this crime. The court found that the defendant was able to meaningfully participate in his defense at trial. The trial court also reviewed the defendant's criminal history. The defendant had one prior conviction for aggravated battery. The court noted that the defendant's attorney characterized the crime as just "being a fight." The trial court concluded that, regardless of the circumstances surrounding the aggravated battery, the State filed the charge, and the defendant was convicted. However, the court concluded that the defendant did not have a long criminal or delinquent history.

¶ 38     The trial court stated that it could not find that the offense was "a just and unfortunate and transient action" and that the actions taken by the defendant could not be construed as impetuous, caused by emotions "or a passion to act." The trial court stated:

"I have had a chance as I said to review the transcripts, review the exhibits including the photographs, and this was a vicious attack and a murder, as I said, two guns

15

were used, and I think the conduct showed depravity at that time, three shots, two

of which either one would have been fatal and certainly one of them was."

The court sentenced the defendant to 25 years for the murder charge, 7 years for the home invasion

charge, 7 years for the armed robbery charge, and 7 years for the aggravated battery charge. The

trial court ordered the sentences to be served consecutively and declined to impose the 25-year

gun enhancement.

¶ 39    The defendant appeals from the 46-year sentence, arguing that the sentence constitutes an

unconstitutional *de facto* life sentence as applied to him both under the eighth amendment of the

United States Constitution (U.S. Const., amend. VIII) and the Illinois proportionate penalties

clause (Ill. Const. 1970, art. I, § 11). The defendant contends that his sentence is unconstitutional

because the trial court did not find that he is "permanently incorrigible."

¶ 40                                      II. ANALYSIS

¶ 41    On appeal, we will not reverse a sentence unless the trial court abused its discretion. *People*

*v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). The trial court must balance the "retributive and

rehabilitative purposes of punishment." *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990). All

factors in aggravation and mitigation must be considered. *People v. Quintana*, 332 Ill. App. 3d 96,

109 (2002).

¶ 42    Initially, we note that the sentences were within the statutory framework for the crimes of

which the defendant was convicted. First degree murder has a sentencing range of not less than 20

years and not more than 60 years. 720 ILCS 5/9-1 (West 2002); 730 ILCS 5/5-8-1(a)(1)(a) (West

2002). Consecutive sentences are mandatory when first degree murder or a Class X or Class 1

felony is one of the offenses and where the defendant "inflicted severe bodily injury." 730 ILCS

5/5-8-4(a)(i) (West 2002). Home invasion (720 ILCS 5/12-11(a)(5) (West 2002)), aggravated

16

battery with a firearm (*id.* § 12-4.2(a)(1)), and armed robbery (*id.* § 18-2(a)(2)) are all Class X offenses with a sentencing range of not less than 6 years and not more than 30 years. 730 ILCS 5/5-8-1(a)(3) (West 2002). In this case, the court sentenced the defendant to 25 years for first degree murder, 7 years for home invasion, 7 years for aggravated battery with a firearm, and 7 years for armed robbery. The sentences were to be served consecutively.

¶ 43    In addition to the sentencing ranges, we also note that the trial court stated on the record that it considered the *Miller* factors as well as all statutory factors in mitigation and aggravation. The court stated that it reviewed all exhibits offered by the defendant, including letters of support and his plan for reentry into society; IDOC records; the presentence investigation report and addendums; the evidence presented at the sentencing hearing, including expert and lay witness testimony; and portions of the defendant's trial transcript.

¶ 44    The sentences imposed in this case followed the statutory limits, and because the trial court considered all factors in mitigation and aggravation, it would be difficult to conclude that the trial court abused its discretion in sentencing. See *Stacey*, 193 Ill. 2d at 209-10. As stated earlier, when a sentence is within the statutory limits, that sentence can only be construed as excessive if the sentence is "manifestly disproportionate to the nature of the offense." *Id.* at 210. Given the brutal nature of Perdew's murder, we conclude that the sentences imposed are not disproportionate to the offense. See *id.* However, before we affirm the sentence, we must address the two constitutional issues raised by the defendant in this appeal.

¶ 45                              A. Eighth Amendment

¶ 46    In 2012, the United States Supreme Court handed down its opinion in *Miller*, 567 U.S. 460. Two 14-year-old offenders were convicted of murder and sentenced to life without the possibility

17

of parole. *Id.* at 465. In both cases, the sentencing courts had no discretion to impose a lesser punishment. *Id.* The Supreme Court explained:

> "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78.

¶ 47    Ultimately, the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479. In 2016, the United States Supreme Court stated in *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), that *Miller* stated a substantive rule of constitutional law and its "conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution." *Montgomery* established that *Miller* was to be construed retroactively. *Id.*

18

¶ 48    After the *Miller* and *Montgomery* decisions, the Illinois legislature enacted section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)), which mandated that sentencing courts consider the following mitigating factors for an offender who was under the age of 18 when he or she committed an offense:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel

19

chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.* § 5-4.5-105(a)." This statute took effect on January 1, 2017.

¶ 49    Thereafter, the Illinois Supreme Court delivered its opinion in *Holman*, 2017 IL 120655. In that case, the defendant was 17 years old when he committed murder. *Id.* ¶ 1. The court discretionarily sentenced him to life without parole for this 1979 murder. *Id.* ¶¶ 1-3. At issue was whether his original sentencing hearing complied with *Miller*. *Id.* ¶ 1. In *Holman*, the supreme court adopted the *Miller* factors in cases where a trial court has the discretion to sentence a juvenile defendant to life imprisonment without parole, stating that this sentence could only be imposed "if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. The supreme court provided directions to courts facing this situation as follows:

"The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* (citing *Miller*, 567 U.S. at 477-78).

20

¶ 50 The *Holman* court noted the difficulty facing courts in situations where the juvenile defendant was sentenced before our legislature enacted section 5-4.5-105 of the Unified Code of Corrections, stating that "any inquiry into the *Miller* factors is backwards-looking." *Id.* ¶ 47. The supreme court confirmed that, when revisiting a juvenile's life-without-parole sentence, the only evidence that matters is the evidence of the defendant's youth and the associated characteristics that existed at sentencing. *Id.* "Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Id.* The supreme court reviewed the record in *Holman* and concluded that, while the sentencing court had no evidence regarding any of the statutory factors in mitigation and only some evidence related to the *Miller* factors, there was ample evidence in aggravation. *Id.* ¶ 50. The mitigating evidence that was considered by the *Holman* sentencing court included information about the death of the defendant's father and stepfather while he was a juvenile, his limited education, and his neurological and intellectual impairment. *Id.* ¶¶ 8, 11-12. Considering all evidence in mitigation and aggravation, the supreme court reviewed the available record and concluded that the sentencing court's conclusion that the defendant was beyond rehabilitation was constitutionally appropriate.[2] *Id.* ¶ 50.

---

[2]In *Jones v. Mississippi*, the United States Supreme Court stated that *Miller* does not require a sentencing court to make an explicit factual finding of permanent incorrigibility before sentencing a juvenile murderer under the age of 18 to a life without an opportunity for parole. *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1318-19 (2021). The eighth amendment allows a juvenile offender to be sentenced to life without parole if the sentence is not mandatory and the sentencing court has the discretion to " 'consider the mitigating qualities of youth' " and to impose a lesser punishment without a requirement that the court engage in a formal fact finding. *Id.* at ___, 141 S. Ct. at 1314-15 (quoting *Miller*, 567 U.S. at 476). As stated by the Illinois Supreme Court in *Holman*: "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. Since the United States Supreme Court issued its opinion in *Jones*, the Illinois Supreme Court has not held that sentencing courts no longer

¶ 51    Initially, we address the defendant's claim that his 46-year sentence constitutes a *de facto* life sentence in Illinois. See *People v. Dorsey*, 2021 IL 123010, ¶¶ 64-65; *Buffer*, 2019 IL 122327, ¶ 39. The Illinois Supreme Court explained in *Dorsey* that *Buffer* set the *de facto* life sentence mark at more than 40 years and that the mark

> "is meant to be the line for a *de facto* life sentence where there is no opportunity to demonstrate rehabilitation and obtain release short of serving more than 40 years in prison. In other words, a judicially imposed sentence that is more than 40 years but offers day-for-day, good-conduct sentencing credit does not cross the *Buffer* line if it offers the opportunity to demonstrate maturity and obtain release with 40 years or less of incarceration." *Dorsey*, 2021 IL 123010, ¶ 64.

While the length of the defendant's sentence certainly meets the more-than-40-year mark,[3] a *de facto* life sentence of a juvenile offender does not automatically violate the eighth amendment's ban on excessive punishment. See *Buffer*, 2019 IL 122327, ¶ 39.

> "[T]he General Assembly has determined that the specified first degree murders that would justify natural life imprisonment for adult offenders would warrant a mandatory minimum sentence of 40 years for juvenile offenders. The legislature evidently believed that this 40-year floor for juvenile offenders who commit egregious crimes complies with the requirements of *Miller*.
>
> *** The Supreme Court has made clear that '[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance' with eighth

---

need to make a determination of permanent incorrigibility before sentencing a juvenile offender to a life sentence.

[3]The record on appeal indicates that the defendant is eligible for parole after 42 years and 10 months.

22

amendment mandates pertaining to juvenile sentencing." *Id.* ¶¶ 39-40 (quoting *Graham v. Florida*, 560 U.S. 48, 75 (2010)).

Thus, as the Illinois legislature has set the mandatory minimum for a juvenile who committed first degree murder at 40 years, the defendant's 46-year sentence is consistent with Illinois law.

¶ 52 The defendant cites a case from the Appellate Court, Fourth District—*People v. Murphy*, 2019 IL App (4th) 170646—as authority for his claim that the 46-year sentence violated the eighth amendment because the trial court did not make a specific finding of "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." The State argues that the defendant's reliance upon *Murphy* is misplaced, as he misstates the holding. The court in *Murphy* acknowledged that the Illinois Supreme Court has determined that a juvenile can receive a life sentence if the trial court considers the *Miller* factors (the juvenile's youth and youth's attendant characteristics) and then determines that the defendant's criminal behavior exhibited " 'irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.' " *Id.* ¶ 47 (quoting *Holman*, 2017 IL 120655, ¶ 46). Nothing in *Murphy* requires that the trial court make an express finding of irretrievable depravity, permanent incorrigibility, or irreparable corruption. Instead, *Murphy* correctly states that, after considering the *Miller* factors, the trial court must *determine* that the defendant's behavior is consistent with depravity. *Id.* As the Illinois Supreme Court stated in *Holman*:

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant

23

characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

In reviewing a sentence, the primary consideration is the evidence of the defendant's youth and its attendant characteristics at the time of sentencing. *People v. Lusby*, 2020 IL 124046, ¶ 35 (citing *Holman*, 2017 IL 120655, ¶ 47). "No single factor is dispositive. Rather, we review the proceedings to ensure that the trial court made an informed decision based on the totality of the circumstances that the defendant was incorrigible and a life sentence was appropriate." *Id.*

¶ 53    As stated earlier in this opinion, the trial court considered the *Miller* factors including the defendant's youth and related characteristics, reviewed all exhibits and evidence introduced at sentencing, reviewed the presentence investigation report and addendums, and reviewed portions of the defendant's trial transcript. Although the trial court did not make any express finding that the defendant displayed "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation," we are not able to conclude that the trial court's sentence was flawed because those precise words were not utilized. The trial court considered the depravity issue at sentencing and found that the defendant's conduct of shooting and ending

24

Perdew's life reflected depravity at that time, but the court did not expressly find that the defendant was irretrievably depraved. Nevertheless, all that the trial court was required to do was determine that this standard was met. The use of those precise words is not mandatory to find that the sentence was constitutionally compliant. Moreover, we note that the United States Supreme Court recently confirmed that it had "unequivocally stated that a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18." *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1318-19 (2021). Accordingly, we find that the trial court's thoughtful and thorough statements and reasoning at the conclusion of the lengthy sentencing hearing demonstrated that the defendant's crime reflected the standards expressed by the Illinois Supreme Court in *Holman* and warranted the issuance of a *de facto* life sentence. See *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

¶ 54    With the *Miller* factors as codified by the Illinois legislature (730 ILCS 5/5-4.5-105 (West 2016)), the trial court stated that the defendant was 17 when the crimes were committed and a good student. Based upon the presentence investigation report, the trial court commented that there was no report that the Department of Children and Family Services had ever been involved with the defendant's family and there was no history of abuse or neglect. The defendant's mother testified at the sentencing hearing that there was family present in the defendant's life, that they participated in social events, and that the environment was safe and nurturing. The trial court also noted that the defendant was able to meaningfully participate in his defense during trial.

¶ 55    The trial court commented on the lengthy report prepared by psychologist Dr. James Garbarino, noting that the report was "fairly subjective." However, the court agreed that the juvenile brain is not fully developed until the age of 25 and stated that this fact was important and was considered in reaching an appropriate sentence. The trial court found gaps in Dr. Garbarino's

report in that there was no factor for a teen's intelligence or higher functioning. The court made this statement because the presentence investigation report indicated that the defendant was a good student and was ranked number four in his graduating class. The trial court also found that it was concerning that Dr. Garbarino's report and his testimony failed to rely upon the particular circumstances of the offense and the role the defendant played—*Miller* factors that should have been considered. The trial court also noted that Dr. Garbarino relied upon the defendant's mother's "serious drug problem" but that there was no verified evidence that his mother had a drug problem. The record reflects that the trial court amply considered Dr. Garbarino's report and his testimony in determining whether there was a connection between the defendant's youth and his commission of this murder. See *People v. Hill*, 2022 IL App (1st) 171739-B, ¶¶ 45-46.

¶ 56    Turning to the *Miller* and statutory factors involving the circumstances of the offense and the defendant's role in the crimes, the trial court stated that the evidence was clear that two guns were used during the crime. Also evident was that the defendant had one of the guns and shot Perdew three times, ending her life. The trial court also noted that there was evidence that the crime was planned.

¶ 57    The trial court noted that it was required to consider other criminal activity. The court stated that the defendant had a felony aggravated battery prior to this murder. The defendant's attorney argued that the battery was the result of a fight between the defendant and another individual. The trial court agreed that most "fights" do not result in charges but noted that this fight did result in the aggravated battery charge. However, the trial court stated that "in the big scheme of things that one case of a fight is not a long criminal or delinquent history."

¶ 58    The trial court also considered the potential for the defendant's rehabilitation and evidence of rehabilitation. The court stated that it had considered what the defendant had accomplished

26

during his 15 years of incarceration. The trial court indicated that having prison and jail employees provide recommendations on the defendant's behalf was uncommon. In conclusion, the trial court stated that it did "consider what you've done as a factor towards rehabilitation and evidence of that."

¶ 59    Before sentencing the defendant, the trial court stated on the record:

"I do find that this was not a just and unfortunate and transient action, that it was not impetuous or caused by emotion[s] or a passion to act. And I don't believe, Mr. Watkins, that this is a minimum sentence case. It's a murder case; it's the most serious case. And there are the additional findings of guilty for home invasion, armed robbery[,] and aggravated battery with a firearm, all Class X felony cases and charges."

¶ 60    Having considered the record on appeal, we are not able to conclude that the trial court's sentence of 46 years was an abuse of discretion or violated the defendant's eighth amendment constitutional rights. The record amply supports the trial court's consideration of the defendant's youth and its attendant characteristics at the time of sentencing. *Lusby*, 2020 IL 124046, ¶ 35 (citing *Holman*, 2017 IL 120655, ¶ 47). As stated earlier in this opinion, "[n]o single factor is dispositive." *Id.* Having reviewed the record, we find that the trial court's sentence was appropriately considered and included a determination that the standard of the defendant's "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" had been met and the *de facto* life sentence was warranted.

¶ 61                     B. Proportionate Penalties Clause

¶ 62    The defendant also argues that his 46-year sentence violated the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11). The proportionate penalties clause of the Illinois

27

Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." *Id.* The proportionate penalties clause expressly includes the rehabilitation objective, and thus this limitation on penalties clause of the Illinois Constitution "went beyond the framers' understanding of the eighth amendment and is not synonymous with that provision." *People v. Clemons*, 2012 IL 107821, ¶ 40 (noting that, while there may be a relationship between the eighth amendment and the proportionate penalties clause, that relationship is unclear).

¶ 63     Although the Illinois Constitution mandates that trial courts utilize both factors to determine the appropriate sentence—the seriousness of the offense and the rehabilitative objective—the Illinois Supreme Court has stated that " ' "there is no indication [in our constitution] that the possibility of rehabilitating an offender was to be given greater weight and consideration than the seriousness of the offense." ' " *People v. Coty*, 2020 IL 123972, ¶ 24 (quoting *People v. Huddleston*, 212 Ill. 2d 107, 129 (2004), quoting *People v. Taylor*, 102 Ill. 2d 201, 206 (1984)). Factors that should be considered in " 'determining the seriousness of an offense include the degree of harm, the frequency of the crime, and the risk of bodily injury associated with it.' " *Id.* (quoting *Huddleston*, 212 Ill. 2d at 129).

¶ 64     In *Huddleston*, the Illinois Supreme Court stated that a sentence violates the proportionate penalties clause "if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." *Huddleston*, 212 Ill. 2d at 130. Illinois courts have declined to define cruel, degrading, or shockingly disproportionate punishment "because, as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *People v. Miller*, 202 Ill. 2d 328, 339 (2002). Thus, courts must review

28

"the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." *Id.* at 340.

¶ 65    Courts have also concluded that a sentence violates the proportionate penalties clause "where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more severely." (Internal quotation marks omitted.) *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). Finally, the proportionate penalties clause is violated if "offenses with identical elements are given different sentences." (Internal quotation marks omitted.) *Id.*

¶ 66    Here, the defendant does not make specific arguments relative to the proportionate penalties clause and focuses on the defendant's rehabilitative potential and the trial court's statement on the record that it "did consider what you have done as a factor towards rehabilitation and evidence of that." A defendant's rehabilitative potential is only one of the factors that a sentencing court should consider. *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010). Of greater importance is the seriousness of the offense. *Coty*, 2020 IL 123972, ¶ 24 (citing *Huddleston*, 212 Ill. 2d at 129, citing *Taylor*, 102 Ill. 2d at 206).

¶ 67    After reviewing the entire record of the defendant's sentencing hearing, we find that the trial court appropriately considered the seriousness of this murder committed by the defendant and decided that the 46-year sentence was appropriate given the seriousness of the offense. See *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 34 (stating that the seriousness of the offense may outweigh the goal of rehabilitating the defendant). The trial court noted and considered the various courses the defendant completed during his incarceration "as a factor towards rehabilitation and evidence of that." Thus, the record supports the trial court's consideration of the defendant's rehabilitative potential. Despite the rehabilitative types of seminars pursued and completed by the defendant, the facts of this brutal crime weighed heavier in supporting the 46-year sentence

29

imposed by the trial court. We do not find that the 46-year sentence was "cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." *Huddleston*, 212 Ill. 2d at 130. We find no basis in the record or the law to conclude that the trial court abused its discretion in imposing this sentence (*Stacey*, 193 Ill. 2d at 209-10) and further conclude that the sentence was not unconstitutional under the proportionate penalties clause of the Illinois Constitution.

¶ 68                              III. CONCLUSION

¶ 69     For the foregoing reasons, we affirm the Massac County circuit court's sentence.

¶ 70     Affirmed.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Massac County, No. 04-CF-85; the Hon. Joseph M. Leberman, Judge, presiding. |
| **Attorneys for Appellant:** | Karen Y. Ranos, of Law Office of Karen Ranos LLC, of Lansing, for appellant. |
| **Attorneys for Appellee:** | Josh Stratemeyer, State's Attorney, of Metropolis (Patrick Delfino, Patrick D. Daly, and Sharon Shanahan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |