2024 IL App (2d) 230287-U
No. 2-23-0287
Order filed November 12, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-2176 |
| DANIEL AGUIRRE, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial counsel was not ineffective for failing to inquire about the effect of gang evidence upon potential jurors during *voir dire* and trial court did not abuse its discretion in sentencing defendant to 75 years' imprisonment.

¶ 2                              I. INTRODUCTION

¶ 3    On April 21, 2023, following a jury trial in the circuit court of Kane County, defendant, Daniel Aguirre, was convicted of the first-degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) of Fernando Carapia and the jury further found that he personally discharged a firearm that proximately caused death to another person during the commission of that offense (730 ILCS 5/5-

8-1(a)(1)(d)(iii) (West 2020)). Hence, defendant was sentenced to a term of imprisonment of 50 years plus a 25-year sentencing enhancement. He now appeals. First, he argues that his trial counsel was ineffective for failing to question the potential jurors about gang bias during *voir dire*. Second, defendant argues that his 75-year prison sentence was excessive. We find neither contention well-founded; therefore, we affirm.

¶ 4                                    II. BACKGROUND

¶ 5     Defendant's trial commenced on April 17, 2023. Prior to jury selection, the trial court admonished the parties, "[d]o not attempt to indoctrinate or pre-educate the jury," and "[d]o not ask questions which highlight any aspects of a party's case." The trial court then affirmed that the parties "can always ask questions about—that explore bias or prejudice." The trial court stated that it intended to ask the venire the following questions concerning gangs: (1) "You may hear evidence in this trial concerning street gangs. Would this information affect you in such a way as to make you unfair to one party or the other?" and (2) "Has anyone or your family or friends ever been negatively affected by street gangs?" Defendant submitted a list of questions for the venire concerning jurors' attitudes about guns and street gangs. Specifically, defendant requested the trial court ask the venire:

> "a. Are you familiar with the neighborhood of 311 S. Spencer St. Aurora?
>
> b. Have you heard about this particular case on the news or social media?
>
> c. Have you heard about Latin King? [*sic*] Or, Gangster Disciples?
>
> d. Do you have any strong opinion about street gang? [*sic*]
>
> e. Have you had any contact with street gang? [*sic*]
>
> f. Have you or any familes [*sic*] or friends ever had [a] negative experience with street gangs?"

The trial court stated that it would ask the first two questions, that it would not ask the third or fifth ones; and that it would address the issues covered in the fourth and sixth questions.

¶ 6     During its opening instructions to the venire, the trial judge informed the potential jurors of the address where the crime occurred and read the names of potential witnesses to them. Addressing the entire venire, the trial judge asked, "Next, you may hear evidence in this trial concerning street gangs. Would this information affect you in such a way as to make you unfair to one party or the other?" He also asked the potential jurors whether they or someone they knew had been adversely affected by "the street use of firearm[s]." The trial court elaborated:

> "The point is, with your personal experience, does the fact that you're going
>
> to hear things about street firearms, firearms being used in the street and street
>
> gangs, does this affect you in such a way – for whatever personal reason you may
>
> have, affect you in a way that makes you think you can't be fair?
>
> Because in the end, that's really the only salient point here is some things
>
> you hear in a trial, sometimes people are so heavily affected by it that they can't
>
> really fairly consider both sides of the case or whether the State has proven their
>
> case beyond a reasonable doubt."

The trial court asked for a show of hands if anyone felt that, because the case was going to have some information about street gangs and gun use, they might be "unfair to one side or the other." No hands were raised. Concerning street gangs, the trial court asked "has anyone in your family or your friends ever been negatively affected by street gangs? Please raise your hand." No hands were raised.

¶ 7     During a break, Juror 83 informed the bailiff that he wished to address two issues with the court. Pertinent here, he indicated that "as far as the gang involvement," 20 years ago, when he

was younger, he did have associates on "that side of Aurora." Upon further questioning, he declined to specify which gang. Juror 83 was ultimately excused by defendant.

¶ 8 The potential jurors were then questioned in groups of four. Juror 68 indicated they had been an alternate on one jury and a juror on a second trial that concerned gangs. They indicated they "learned more about gangs than [they] ever knew." Defense counsel asked whether they would bring any feelings from that case into this case, and Juror 68 replied, "No." After mentioning that experience with street gang testimony, the defense moved on to other questioning and did not ask any questions about street gangs. Juror 68 was also excused by defendant. Defense counsel did not ask any jurors about whether or not they would find a witness more or less believable if the witness was in a gang.

¶ 9 After the jury was empaneled, the trial court gave the jurors their initial instructions. It instructed the jury regarding biases:

"We all have feelings, assumptions, perceptions, fears and stereotypes about others. Some biases we are aware of and others we might not be fully aware of, which is why they are called implicit biases or unconscious biases.

Our biases affect how we act, favorably or unfavorably, towards someone. Biases can affect our thoughts, what we see and hear, whom we believe and disbelieve and how we make important decisions.

As jurors, you're being asked to make important decisions in this case. You must resist jumping to conclusions based on personal likes or dislikes. You must not let bias, prejudice or public opinion influence your decision. You must not be biased in favor of or against any person because of his or her race, ethnicity, national ancestry, religion, gender, sexual orientation, age, disability or socioeconomic status.

Your verdict must be based solely on the evidence presented."

The trial court further instructed the jury regarding witness testimony:

"Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

It then explained what opening statements and closing arguments were, including that they do not constitute evidence.

¶ 10    The case proceeded to trial. Jose Diaz, the victim's brother-in-law, was the first witness for the State. Jose testified that on the day of the shooting, January 15, 2021, he was living at 311 South Spencer Street with his mother and father, his sister, Diana, his brother-in-law, Fernando Carapia, and his brother, Alfredo Diaz. At the time of the shooting, Jose, Fernando, and Fernando's six-year-old son were at the home. At approximately 4:45 p.m., Jose was upstairs in his room at the front of the house when, after hearing four or five gunshots, he went to the stairs leading to the first floor. He saw Fernando running up the stairs, unable to speak, with blood coming from his mouth. When Fernando reached the top of the stairs, he collapsed and fell back all the way down the stairs. Jose called 911 and was on the phone with the dispatcher when the police arrived (the 911 call was played for the jury, and it was generally consistent with Jose's testimony). In his statement to an Aurora police officer, Jose said that his six-year-old nephew was still in the house and that he did not know of any issues that his brother, Alfredo Diaz, was having. Jose further testified, over defendant's objection, that this was not the first time the house had been shot at. Jose confirmed that his brother Alfredo was not at home during the shooting.

Jose stated that neither he nor Fernando were gang members. Defense counsel did not cross-examine Jose.

¶ 11 The State then called Officer Wagner of the Aurora Police Department. At the time of the shooting, he was a field-training officer assigned to the patrol division. Wagner and a fellow officer responded to a 911 call of a gunshot victim at the 311 South Spencer Street residence. He described the scene as "chaotic." After checking the perimeter and the rear of the house, he entered the home and approached the victim, Fernando, who was lying face down in a pool of blood at the base of the stairs, in the "kitchen area." He testified that Fernando appeared to be "in the last stage of, like, agonal breathing." After rolling the victim onto his back, he did not find a pulse. He then went upstairs to check for any additional victims and found Fernando's child hiding in a room. He ran to him, picked him up, and grabbed a blanket to cover his head so that the child would not see his father's body when they had to step over him to exit the house. Wagner identified a number of photographs of the residence where the shooting occurred and of the victim, which were published to the jury. Defense counsel declined to cross-examine Wagner.

¶ 12 Diana Diaz, the wife of Fernando Carapia, was the State's next witness. She testified that she had left the home at 9:30 and was still at work when the shooting occurred. Their child was six years old, and she was also pregnant. She said Fernando had been to work that day and had gotten home "maybe like around 3:00-ish." He was changing the lights on his car. Diana described his car as a white Acura, which he would park in the area by the detached garage. She acknowledged that Aurora has gang activity and said that neither her brother, Jose, nor her husband, Fernando, were in a gang. She stated that she did not know if Alfredo was in a gang. She confirmed there had been shootings "at or near" her house in the recent past. She allowed police to search the house, take photographs, and recover evidence. She also turned over her

home's surveillance recording systems to police, although they were not able to "find anything" on the cameras. Defense counsel did not cross-examine Diana.

¶ 13    Wallace Giles next testified that he lived at 306 Hinman Street (Hinman Street is parallel to and behind Spencer Street) to and was home at the time of the shooting. Hearing sounds similar to fireworks, he looked out the bedroom window facing the backyard and saw someone running in between the garage and the fence. He noted that the person was running awkwardly, with his hands by his sides because his left hand was holding up his baggy pants and he was trying to put away a black automatic pistol with his right hand. The person was wearing a dark hoodie, which he described as reddish or maybe a little dark red. The person had something covering their face. On cross-examination, Giles stated that he called the police. He described the person as no more than 5' 7" with a build between small and medium.

¶ 14    Jason Huerta was the State's next witness. He testified with the aid of an interpreter. Huerta stated that he lived at 576 North Avenue and was painting his bathroom at the time of the shooting. Hearing gunshots, he looked out the window and saw a male wearing a light gray hooded sweater running towards what looked like a gray Honda Accord parked on Hinman Street. The person got into the front passenger seat, the car reversed a bit, but then started driving forward and almost ran into a delivery truck. On cross-examination, he testified that he told the police on January 18, 2024, that the suspect was "somewhat tall" but disagreed that the suspect was taller than his own 5'9" height. He confirmed that he had told police that he was unable to tell if the suspect was white or black. He had described the suspect as wearing a sweatshirt with a hood but had not specified a color. He acknowledged that "it was difficult to see from [his] home" and an apple tree was in his line of sight (albeit one that had shed its leaves). On redirect-examination, Huerta described the car the shooter got into as light gray.

¶ 15    The State next called Sergeant Ryan Tinsley of the Aurora Police Department. In January 2021, he was assigned as an evidence technician. He testified that he photographed and processed the 311 South Spencer residence. He photographed the white Acura in the driveway and noted three bullet holes on the rear driver's side of vehicle. He described three bullet holes in the house siding by the rear door, multiple bullet fragments outside the door, one bullet found inside a boxed car seat inside the house by the rear door, and one bullet found in the siding by the rear door. Six fired nine-millimeter cartridge casings were found on the ground in a neighbor's yard and one was found in the yard of 311 South Spencer. Tinsley described at least 30 fresh shoe prints in the snow—both coming and going—along the pathway between the fence and the detached garage leading to the back of the property and back towards Hinman Street. He also processed a Canik nine-millimeter slide and barrel, recovered at the 712 Spencer Street address (where the shooter fled to), for fingerprints.

¶ 16    The State then called Investigator Blaskey of the Aurora Police Department's Special Operations Group, which covers both gangs and narcotics. Blaskey testified that there were at least three shootings that occurred in the spring of 2020 in the area of 311 South Spencer Street. He was also familiar with 712 South Spencer and testified that it was associated with "some Latin King gang activity." He was with the team that executed the search warrant on 712 South Spencer Street, and, while there, he viewed video surveillance from the home that showed a silver Honda pulling into the driveway and three subjects getting out and going into the residence. He identified the person exiting the front passenger side of the vehicle, in the white hooded sweatshirt, as defendant.

¶ 17    Investigator Matt Bowman of the Aurora Police Department testified that he and Investigator Vogiatzi drove to the 712 South Spencer residence upon hearing of the shooting at

311 South Spencer Street (the former is about four blocks from the latter). He explained that, through former investigations, he was aware of an "active feud" between Alfredo Diaz and other Latin Kings, so he went to that address because it was a known Latin King residence and hangout. They observed a silver Honda in the driveway that was a known Latin Kings vehicle and a suspect vehicle in the shooting. They surveilled the house for approximately six hours, observing that the Honda was not moved and that no people came into or exited the residence. He then left his surveillance to participate in the execution of the search warrant. He described the events that night: a group of approximately 20 SWAT members knocked loudly at the door for roughly 35 seconds, breached the door with a ramming device, deployed a distraction device to cover the officers' retreat, positioned themselves behind the armored personnel vehicle in front of the residence, and played loud, recorded announcements in both English and Spanish that informed the residents that a search warrant was being executed and ordered them to exit the residence with their hands in the air. The residents complied, except for two men (DeLuna and Ivan Mondragon) and a child, who the police encountered when they entered the house. When defendant exited the residence, he was wearing a white hooded sweatshirt, jeans, and black and gold shoes. Booking photos of defendant and Valles show that they were wearing the same clothing that they wore when they exited the residence that night. On cross-examination, Bowman explained that the Honda Accord was already parked behind the residence when they arrived.

¶ 18    Detective Matthew Adam of the Aurora Police Department participated in the execution of the search warrant at the 712 South Spencer residence. Two rounds of ammunition, one nine-millimeter and one .40 caliber, were recovered from the bottom of the first-floor bathroom toilet bowl. In a basement bedroom closet, a firearm barrel was recovered from the unfinished ceiling. In the basement bathroom toilet tank, a firearm slide and tension spring was recovered. Two days

later, on January 18, 2021, Adam returned to the residence to search the attic based on specific information given by Valles. A firearm frame was recovered underneath insulation in the unfinished, crawlspace portion of the attic at that time. Adam confirmed all of the firearm parts found were part of the same nine-millimeter firearm based on the serial numbers.

¶ 19   Jeffrey Parise, a forensic scientist with the Illinois State Police, was recognized by the trial court as an expert in the field of firearms and firearms identification. Parise testified the recovered fired cartridge casings were nine-millimeter. The two recovered, fired bullets tested were nine-millimeter/.38 caliber. He confirmed that the recovered handgun frame, slide, barrel and recoil spring were from the same firearm—a Canik-manufactured, nine-millimeter, Luger semiautomatic pistol. His testing showed that all of the recovered cartridge cases, and the two recovered fired bullets, were fired from the recovered firearm.

¶ 20   Detective Darrell Moore of the Aurora Police Department testified that he collected the clothes of the individuals, including defendant, that were being held in the booking area holding cells. He stated that these individuals were transported separately, in transport vans, directly to the booking area. Detective Moore confirmed that he had not fired his weapon that day. Moreover, no one in the police department had fired a weapon in that area that night; and, he had not been in contact with anyone who had fired a gun that night. Moore had been trained in gunshot residue collection and how to avoid contamination of evidence.

¶ 21   The State then called Kevin Gillespie, a forensic scientist in the trace chemistry section of the Illinois State Police Forensic Science Center at Chicago. The trial court recognized Gillespie as an expert in trace chemistry. Gillespie testified that the right cuff of defendant's hooded sweatshirt tested positive for gunshot residue. That is, the sweatshirt had been in the vicinity of a discharged firearm or had come into contact with gunshot residue on another item. The presence

of gunshot residue on a person's clothing does not "mean that they actually fired a gun." Gillespie could not say how the gunshot residue got on defendant's sweatshirt.

¶ 22   Leslie Mendoza was the State's next witness. She lived in a second-floor apartment across the street from the crime scene. On January 15, 2021, she heard gunshots, looked out the window, and saw a man standing across the street. She said that "he was pointing at somebody and he had shot whoever it was." She remembered him wearing a gray hoodie, a white t-shirt, and jeans. She then saw the man go towards the back of the house. On cross-examination, Mendoza did not remember telling a police officer on January 15, 2021, that the man was wearing a blue hoodie, but she stated that "at the time [she] stated it was a different color." She maintained, at trial, that she now thought he had worn a gray hoodie.

¶ 23   Officer Manuel Cuevas-Escobedo, an Aurora police officer, was the State's next witness. The trial court recognized him as an expert in "street gang identification and activity." He explained in detail what constitutes a gang, gang culture, and how gangs function. Cuevas-Escobedo testified that there had been prior shootings in the area of 311 South Spencer Street, that Alfredo Diaz was a documented Latin Kings member, and that Jose Diaz and Fernando Carapia were not gang members. He said that 712 South Spencer Street was also associated with the Latin Kings and that resident DeLuna was a Latin Kings member. At the time of the shooting, another Latin Kings member, Valles, was also staying at the residence.

¶ 24   Cuevas-Escobedo then described the Latin Kings colors, hand signs, and tattoos. He identified a photograph of defendant with two other individuals who were both making gang hand signs. One of the other individuals had a Latin Kings tattoo on his face. He confirmed that all three men were known Latin Kings members. He added that typical Latin Kings colors were yellow and black, gold and black, and red and black—the latter worn to signify when they are "at

war with someone, a target or another gang." The State showed a photograph of a pair of black and yellow Nikes that would be considered gang clothing. Cuevas-Escobedo explained the Aurora Police Department's nine-factor criteria to determine if an individual is a gang member. He described the detailed documentation of gang members with "contact sheets."

¶ 25    Around the time of the shooting, Cuevas-Escobedo testified, Alfredo Diaz, despite being a Latin Kings member, was documented as hanging out with rival Gangster Disciples members and the Latin Kings were not happy with these interactions. He testified that Valles, Bello, Mondragon, and DeLuna were all Latin Kings gang members. Cuevas-Escobedo identified defendant as being a Latin Kings member since 2019 with the nickname Primo, although the police documented gang contacts for defendant dating back to 2013. He indicated that Valles was a higher-ranked member than defendant. Defendant was a "shorty," which is a lower ranking member that had not yet earned his crown. To earn one's crown, one typically had to commit an act of violence or some other criminal act in furtherance of the gang. On cross-examination, Cuevas-Escobedo indicated that Valles, as an enforcer, would be in charge of ensuring that any missions given to lower-ranked members were carried out and that he would handle the guns. Valles came to Aurora from Chicago, and Cuevas-Escobedo did not know how he had earned his crown. Cuevas-Escobedo acknowledged that defendant did not have any gang-related tattoos.

¶ 26    The State then called Valles. He testified that in January 2021, he was a member of the Latin Kings. He knew defendant. Valles was arrested and told he was being charged with first-degree murder for the death of Fernando Carapia. Six months later, he gave police a recorded statement of all information concerning the homicide at issue here in exchange for entering into negotiations with the State. At that time, he signed a contract providing that if he testified contrary to the substance of that statement, the State could use those statements against him. Separately,

six months after that statement, Valles entered into another agreement with the State to plead guilty to a new count, conspiracy to commit first-degree murder, a Class 1 felony, and to be sentenced to 15 years. He also pled guilty to an earlier offense of the unlawful use of a weapon by a street gang member, for which he received a five-year sentence. As part of the agreement, the counts of first-degree murder he had been charged with remained open and pending.

¶ 27    Turning to the instant offense, Valles testified that, on January 15, 2021, he was driving a silver Accord and staying at 712 South Spencer Street. Around 2:30 p.m., he picked up Bello and then they picked up defendant from his home on Loucks Street. Defendant was carrying a weapon and got into the front seat. Valles believed the weapon was a "Nation" gun—meaning that it belonged to the gang. The three men drove around town, smoking marijuana, and stopped at a gas station and a McDonald's. After picking him up, defendant was always seated in the front passenger seat and Bello was in the back. The State entered into evidence and walked Valles through a video that captured the car's movements through the city, at the gas station, and at the McDonald's. Valles testified that defendant was in the front seat. Valles described driving past Fernando's house and seeing somebody go towards the back of the driveway. They assumed it was Alfredo Diaz because of his height and because he was wearing a hoodie. They drove to Hinman Street, which is behind Fernando's house, where they had an open view to the back of it. Defendant told Valles to stop the car and got out. Valles recalled hearing five shots (though he acknowledged eight were recorded on the video) and then defendant got back in the car and said, "I got him." They almost hit a FedEx truck as they left the area. Defendant changed clothes and wiped down the gun as they drove back to the 712 Spencer Street address.

¶ 28    Inside the house, defendant asked Valles to hide the gun, so Valles took it and placed it into the duct downstairs. DeLuna, who was home at the time, instructed defendant to "switch clothes."

Defendant switched his shoes, but Valles was unsure about the rest of his clothing. At the house, they checked social media and saw that the victim was not Alfredo Diaz. Defendant's reaction was to say, "Fuck it," and Valles indicated that defendant did not care that the victim was not Alfredo Diaz. They drank for a while, and Valles went to sleep. Valles was woken up later by defendant and DeLuna, who demanded the gun, so he retrieved the still-intact weapon, gave it to them, and went back to sleep. Later, he was awakened again by defendant telling him there was a drone outside. Looking outside, he saw a SWAT team and realized they were being raided. Inside the house, he broke down the gun and hid the pieces. Valles was arrested.

¶ 29    Valles explained that he was no longer a member of the Latin Kings. This was due to his cooperation with the State. He covered his gang tattoos.

¶ 30    On cross-examination, Valles admitted that he initially lied to the police about living elsewhere instead of acknowledging his residence at 712 South Spencer. Defendant had been in his car previously. Valles confirmed he had handled the gun before and was unsure whether it was a Nation gun. He used to be friends with Alfredo Diaz but at the time of the shooting, they were no longer friends. Valles explained that Alfredo and his friends thought Valles was having an affair with the mother of one their babies. He confirmed he was a higher rank than either defendant or DeLuna, but denied ordering defendant to kill anyone. Valles was arrested and charged with murder. Valles was facing a sentence of 20 to 60 years—served at 100%—with the possibility of a 15-year enhancement. Valles confirmed that, after cooperating with police, he would be serving 15 years on a conspiracy to murder (served at 50%) and 5 years (served at 50%) for a pending charge of unlawful possession of a weapon by a street gang member. The murder charge is still pending, and Valles was required to testify consistently with his original statement to police to avoid it being renewed.

¶ 31   On redirect-examination, Valles explained he stopped behind the victim's house because he knew the house had cameras in the front. He also said he did not shoot anyone that night. On recross-examination, he agreed that he did not want to spend his life in prison.

¶ 32   Officer Peter Bancroft, an Aurora Police Department evidence technician at the time of the shooting, next testified that he processed a silver Honda Accord on January 16, 2021. He recovered a water bottle from the driver's door, lower pocket; several small, burnt, cigarette-style items smelling of cannabis from a tin in front of the gear shift; and a McDonald's receipt from the back seat. He then processed the car for DNA and fingerprints. He collected three fingerprints from the front passenger door area, and a print from the drivers' side water bottle and submitted them for processing.

¶ 33   On cross-examination, Bancroft acknowledged that the automobile had not been processed for gunshot residue. Bancroft was also part of the team that processed the 712 South Spencer residence. The house had already been searched, and he was asked to take photographs and collect evidence. He testified that there were nine-millimeter cartridges recovered throughout the house in different locations. He was able to lift one fingerprint from a cartridge recovered in a shelving area between the dining and front rooms. He also recovered parts of a handgun.

¶ 34   The State's next witness was Julie Smith, an Aurora Police Department forensic scientist. She was recognized by the trial court as an expert in the area of latent print examinations. Smith identified a palm print from the silver Honda's interior passenger side door as that of defendant. She also identified the print on the water bottle recovered from the driver's side door as that of Valles's right thumb. On cross-examination, she acknowledged that she cannot tell when a fingerprint is placed on to an object.

¶ 35   The State then called Sergeant Jason Cudebec of the Aurora Police Department. He is the

lead detective for this investigation. A 911 call was made at about 4:48 p.m. reporting the shooting. He arrived at the crime scene at about 5:15 p.m.

¶ 36    During the execution of the first search warrant at the 712 South Spencer residence, Cudebec reviewed camera footage from the house and saw the Honda pull into the driveway at 4:49 pm, 62 seconds after the initial 911 call. Another officer (Blaskey) reviewed a video recovered from the residence and was able to identify defendant as the person exiting the front seat. Cudebec testified that police were able to determine what clothing defendant was wearing earlier in the day through video footage from a gas station. That video showed the silver Honda parked at a gas pump. Valles was driving. They obtained a second search warrant for the residence, pursuant to which ammunition and parts of a handgun were recovered.

¶ 37    A third search warrant was obtained two days later (January 17, 2021). That warrant authorized the police to look for "a McDonald's box and shoes that [they] had not recovered *** that matched the shoewear impression that was on scene." Cudebec explained that an evidence technician had discovered footprints leading from where the Accord had stopped on Hinman Street to where shell casings were recovered near the site of the shooting. He added that the footprints "showed a distinct tread pattern of the shooter, of the shoes that he was wearing." Cudebec further explained that, in the video recovered at 712 South Spencer, defendant exited the Honda wearing a pair of solid black shoes. The shoes that defendant was wearing when arrested were not taken into evidence, because they were black and gold.

¶ 38    Cudebec further testified that after charging Valles with murder and showing him a photo of the men exiting the Honda at the 712 South Spencer address, Valles did speak directly about the shooting, his role, and the roles of the other two men in the car. Based on Valles's information, Cudebec submitted defendant's white sweatshirt for gunshot residue testing. Valles's clothes were

not submitted for gunshot residue testing because, based on witnesses' statements and surveillance videos, the Accord was moving during the actual shooting, and Valles, as the driver, would not have been able to leave the vehicle. He was thus excluded from being the shooter.

¶ 39    Cudebec testified that, later the same day, Valles indicated that he wanted to speak with detectives. He told them where the lower portion of the firearm used in the shooting was. Based on that information, the police obtained a fourth warrant and recovered the rest of the gun. They never recovered the shoes defendant was wearing when he exited the Accord shortly after the offense.

¶ 40    The State played a videotape, with Cudebec narrating the addresses of the various camera sources along the route, which showed the silver Honda leaving 712 South Spencer, traveling to the McDonald's, traveling to the gas station, then to the crime scene, and finally back to the 712 South Spencer residence. In one of the videos, there are audible gunshots, which, when corrected for being exactly an hour ahead, occurred at 4:47-4:48 p.m.

¶ 41    Cudebec testified that he met with Valles and his attorney on June 18, 2021. A proffer contract was made. There was no discussion with Valles about what might happen after his statement was made. Before an offer could be made, the State had to "deem that his statement on that date was truthful in all respects."

¶ 42    On cross-examination, Cudebec was asked about his interviews with Valles and the proffer agreement made. He testified that on January 18, 2021, "[t]here was a contract" memorializing that Valles was getting a deal. Cudebec did not know the terms of the deal other than that Valles "had to provide the truthful, in all respects, account of what happened on January 15th." The State then rested. Defendant made a motion for a directed verdict, which was denied.

¶ 43    Defendant first called Officer Shawn McCleary, an evidence technician with the Aurora

Police Department. McCleary took photographs at the 712 South Spencer residence over a period of two days. McCleary described the house as "messy." He stated that he "possibly" removed a pair of black and gold shoes from the residence and "possibly turned [them] over, either into evidence or turned over to the investigators." On cross-examination, McCleary agreed that they were looking for "a certain pair of shoes and specific clothing that the officers were hoping to find that correlated with the video of the Defendant."

¶ 44    The defense then called Gina Minetti, an Aurora Police Department forensic scientist, who was recognized by the trial court as an expert in the area of latent fingerprint examination. Minetti conducted a latent fingerprint analysis on a bullet recovered at 712 South Spencer and identified a fingerprint on it as belonging to Valles. At the conclusion of her testimony, the defense rested.

¶ 45    During deliberations, the jury sent a note to the trial court requesting a photograph of Bello. With the parties' agreement, the photograph was sent to the jurors. Defendant was convicted of first-degree murder. The jury further found that defendant personally discharged a firearm that caused the death of another during the commission of the offense.

¶ 46    A sentencing hearing was held on June 14, 2023. Officer Timothy Young testified that, on September 15, 2019, he investigated the beating and stabbing of a young man at a festival. There was a video in which defendant can be seen punching and kicking the victim as the victim was on the ground. Defendant and another individual, also a member of the Latin Kings, were both arrested. Defendant made a statement in which he admitted that he punched and kicked the victim. On September 5, 2020, there was a shooting incident, and a suspect vehicle was identified. The vehicle was observed with five active Latin Kings street gang members in it—including defendant and Valles. On October 10, 2020, defendant was observed walking with another Latin Kings street gang member. Officers attempted to speak with defendant, but defendant refused to cooperate.

¶ 47    The State then called Darren Pedota, a police officer with the City of Aurora.  He testified that on April 20, 2020, he attempted to pull over a vehicle which fled at a high rate of speed and eventually crashed.  Defendant exited the vehicle and unsuccessfully attempted to flee.  A gun was found in the vehicle.  While being medically treated at the scene, defendant attempted to swallow a clear plastic bag that contained a white, powdery substance.  Defendant was charged with unlawful possession of a controlled substance.  During another traffic stop, defendant called Pedota a "bitch."  On cross-examination, Pedota agreed that during the incident on April 20, 2020, the car that crashed did not belong to, nor was it driven by, defendant.

¶ 48    Officer Francisco Ibarra, a Kane County corrections officer, next testified for the State.  He stated that defendant was currently in the Kane County Jail and had been there since December 2021.  Since his incarceration, defendant has two new tattoos on his wrist.  Defendant has had "probably ten or more" incident reports; including two involving having jail-made alcohol in his cell.  Defendant was involved in another incident that Ibarra described as a "jailhouse riot."  Ibarra explained that "the detainees were using their mattresses to block the feed slots of their cells."

¶ 49    Cuevas-Escobedo, who had testified during defendant's trial, returned to the stand and testified that defendant had his first documented gang contact sheet in high school, in September 2013.  On February 14, 2014, defendant was first charged with a juvenile offense in Kane County, for which, he received gang specific probation.  On February 19, 2017, defendant violated that probation when he was seen running across the road with a documented Latin Kings street gang member.  Defendant had two other documented gang contacts with Latin Kings street gang members.  On June 22, 2019, defendant was charged with resisting or obstructing a police officer who was trying to arrest him on an outstanding warrant.  That case was still pending at the time of the sentencing hearing.  On March 29, 2020, another gang contact sheet was generated when

defendant fled from officers, with another Latin Kings street gang member, during a shooting investigation. In the 11 months between the January 15, 2021, shooting at issue here and defendant's arrest on December 17, 2021, defendant was arrested five times within the City of Aurora and eight gang contact sheets were generated.

¶ 50    The victim's wife and brother-in-law made statements recounting the effect the victim's murder has had upon her family. Defense presented letters from defendant's mother, sister, and a teacher as well as photographs of defendant's family. He also submitted transcripts and certificates of education programs that he completed while in Kane County Jail. Defendant addressed the court and apologized for his actions. He also recounted the circumstances under which he was raised, which were difficult.

¶ 51    The trial court sentenced defendant to 50 years' imprisonment plus a 25-year enhancement for discharging a firearm that proximately caused the victim's death. The trial court stated that it had considered the evidence offered at trial, the evidence and arguments presented during the sentencing hearing, and the applicable law. It noted that probation was not an authorized sentence for first-degree murder and that the statutory sentencing range was 20 to 60 years' imprisonment, served at 100 percent. Moreover, section 5-8-1 of the Unified Code of Corrections (730 ILCS 5/5-8-1 (West 2020)) provides for a sentence enhancement of 25 years to natural life if an individual discharges a firearm that "proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person."

¶ 52    The trial court found that "defendant was born on March 16, 1998" and was therefore 22-years old at the time he committed the offense. In aggravation, the trial court found: (1) that "defendant has a history of prior delinquency or criminal activity"; (2) that "the sentence is necessary to deter others from committing the same offense"; (3) that defendant committed this

offense, a felony, while on pretrial release for another felony; and (4) that defendant committed this offense "related to the activities of an organized gang." See 730 ILCS 5/5-5-3.2 (West 2020). In mitigation, the trial court found that "defendant's criminal conduct was induced or facilitated by someone other than the defendant" (730 ILCS 5/5-5-3.1(5) (West 2020)); however, it added that evidence of this was "vague, it wasn't corroborated, [and] it was slight that another person may have had a motive." The trial court also noted that beyond a motive, Valles also outranked defendant.

¶ 53    The trial court reviewed the presentence report. It noted a statement defendant made to the people who performed the presentence evaluation indicating that he "like[d] the adrenaline rush of doing risky things, that he has stolen things and likes getting away with it." The report revealed that defendant had previously been convicted of (1) possession of a controlled substance; (2) driving while his license was revoked; (3) unlawful street gang conduct; (4) resisting a peace officer; and (5) another driving while revoked. It also showed three sentences to the Department of Corrections. Moreover, defendant had "been placed on court supervision, conditional discharge, or probation as a juvenile and an adult a total of eight times."

¶ 54    The trial court stated that it had considered defendant's rehabilitative potential and his youth, including "its attendant circumstances." It noted that the victim had no relationship to any gang. It acknowledged defendant's in-court apology and defendant's statements that he was sad and wanted to "be a positive force in his family and his community." The trial court then observed that defendant remained free for about 11 months after the murder. During this time, it quickly became clear to defendant that the man he had killed was not in a rival gang and was "somebody that didn't have a beef with anybody or nobody had a beef with him." The trial court continued, "Now, I put [defendant's statements] up against the defendant preached the sadness and sorrow

[sic] in his statement, as I told you. I wanted to talk about the—He wanted to talk about good works going forward in this matter. So I wanted to talk a little bit about what he did in that one year." The trial court then noted that during this period, defendant was driving with a revoked license three times and unlawful possession of medical marijuana. A warrant for defendant's failure to appear was also issued. The court then stated:

"During that year while you're aware of what has happened here and you're still out of custody, what I looked for the defendant to do was walk the straight and narrow and understand what a horrible tragedy occurred at his hand for no reason whatsoever and change his life. He didn't change his life at all. He's still committing crimes."

According to the trial court, defendant's conduct "belays [*sic*] his statement in allocution." The trial court then determined that a sentence of 50 years plus a 25-year enhancement, as requested by the State, was warranted. The trial court acknowledged that this was a *de facto* life sentence. This appeal followed.

¶ 55                           III. ANALYSIS

¶ 56    On appeal, defendant raises two main issues. First, he argues that trial counsel was ineffective for failing to adequately question potential jurors about any biases they may have had against street gangs during *voir dire*. Second, defendant asserts that his sentence is excessive. We find neither contention well-founded.

¶ 57             A. Ineffective Assistance Of Counsel During *Voir Dire*

¶ 58    Defendant first argues that his trial attorney did not adequately explore the subject of bias regarding gangs during *voir dire*. When a defendant challenges the effectiveness of trial counsel, the familiar analysis first set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), controls. See also *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). To

succeed on such a challenge, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that this deficient performance prejudiced the defendant. *People v. Johnson*, 2021 IL126291, ¶ 52. A failure to satisfy either prong is fatal to such a claim. *Johnson*, 2021 IL 126291, ¶ 53. "Although the performance and prejudice components of an ineffectiveness inquiry present mixed questions of law and fact [citation], our standard of review for determining whether a defendant was denied the effective assistance of counsel is ultimately *de novo*. [Citation.]" *Id.* ¶ 52.

¶ 59 The first prong is assessed in light of "prevailing professional norms." *People v. Morgan*, 187 Ill. 2d 500, 548 (1999). Matters constituting trial strategy generally may not form the basis of an ineffectiveness claim. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Counsel's conduct during *voir dire* is generally deemed a matter of trial strategy. *People v. Metcalfe*, 202 Ill. 2d 544, 562 (2002). To show prejudice under the second prong, a defendant must establish that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceedings would have been different. *Johnson*, 2021 IL 126291, ¶ 52. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the proceedings. *People v. Spann*, 332 Ill. App. 3d 425, 433 (2002). Actual prejudice must be shown; mere speculation is insufficient. *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 60 Here, defendant challenges counsel's conduct during *voir dire*. "The fundamental purpose of *voir dire* is to ensure the selection of an impartial jury." *People v. Lanter*, 230 Ill. App. 3d 72, 75 (1992). "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). At issue here is bias concerning street

gangs.

¶ 61    Defendant is undeniably correct that street-gang evidence pervaded this case. Evidence regarding street gangs is regarded as particularly problematic because " 'there is a deep, bitter and widespread prejudice against street gangs in every large metropolitan area in America.' " *People v. Goldsberry*, 259 Ill. App. 3d 11, 16 (1994) (quoting *People v. Parrott*, 40 Ill. App. 3d 328, 331 (1976)). Such evidence has the potential to inflame the passion of the jury and arouse prejudice against a defendant. See *People v. Silva*, 231 Ill. App. 3d 127, 139 (1992). However, "even a gang member has a constitutional right to have his case determined on the basis of the evidence of his guilt or innocence, by a jury that is not predisposed to find him guilty solely because of his gang membership." *People v. Jimenez*, 284 Ill. App. 3d 908, 912 (1996). Nevertheless, where gang-related evidence is relevant to a material issue, it may be admitted. *Id.* (quoting *People v. Smith*, 141 Ill. 2d 40, 58 (1990)).

¶ 62    Due process guarantees a defendant a right to an impartial jury. *People v. Coe*, 54 Ill. 2d 401, 411 (1973). Therefore, if evidence of a defendant's gang affiliation will be presented to a jury, a trial court is "under a clear duty to insure during *voir dire* that the jury select[ed is] free from prejudice against this group." *Jimenez*, 284 Ill. App. 3d at 912. Similarly, "when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, a defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias." *People v. Strain*, 194 Ill. 2d 467, 477 (2000). Here, the trial court told defense counsel that she could "ask questions about— that explore bias or prejudice" (though the trial court forbid questions regarding whether the venirepersons had heard of the Latin Kings or Gangster Disciples or had any contact with street gangs). Moreover, during *voir dire*, the trial court asked the venire: "So those two topics, street

gangs and street gun use, does anybody feel that just the fact that this case is going to have some information about that, do they feel that makes you unfair to one side or the other?" Nobody responded affirmatively. It also asked. "Has anyone in your family or your friends ever been negatively affected by street gangs?" It again received no affirmative response. Defense counsel asked a juror—who they later excused—one question about gangs (the juror had indicated under questioning by the trial court that he had associates who were gang members 20 years ago, and defense counsel asked whether the juror would be comfortable revealing which gang; the juror declined and defense counsel did not pursue the issue). Defense counsel did not otherwise question the venire about gangs.

¶ 63    Defendant now contends that counsel's failure to explore this issue further during *voir dire* constitutes the ineffective assistance of counsel. He complains that counsel did not ask venirepersons whether they "were biased against street gang members and whether they would find a witness less believable simply because he or she was affiliated with a street gang." In support, defendant relies chiefly on our supreme court's opinion in *Strain*, 194 Ill. 2d 467.[1] Like this case, street-gang evidence was pervasive in *Strain*. *Id.* at 477. The trial court in *Strain* asked two questions of the venire pertinent to the gang issue: (1) "whether the juror, any member of the juror's family or a close friend of the juror had ever been involved in a gang" and (2) "whether the juror could be fair to both sides." *Id.* at 470-71. The *Strain* court found that the first question was insufficient to probe a venireperson's potential bias: "A prospective juror may have had no direct

_____

[1] We are cognizant that *Strain* involved questioning by the trial court rather than counsel; however, in either case, it provides sound guidance regarding the adequacy of the questioning at issue.

or indirect involvement with gangs, yet be biased against gang members or hold a negative opinion on the subject of gangs." *Id.* at 480. The supreme court did not reference the second question in its analysis; however, the appellate court opinion that the supreme court affirmed explained that the second question was irrelevant to the inquiry:

> "The State further argues the addition of the last question asked to each prospective juror—'can you be fair to both sides here'—satisfied the probe regarding gang bias. However, it is a common question at the end of *voir dire* proceedings, and it refers to an overall determination of the prospective juror's state of mind. Since no question was asked during *voir dire* about bias towards gangs, this final question fails to encompass gang bias and thus, is irrelevant to this discussion." *People v. Strain*, 306 Ill. App. 3d 328, 337 (1999).

Ultimately, the supreme court reversed the trial court, holding, "Because of the trial court's refusal to probe for gang bias, [the] defendant was denied an informed and intelligent basis on which to assert challenges for cause or to exercise peremptory challenges." *Strain*, 194 Ill. 2d at 481.

¶ 64 Defendant contends that a similar result is warranted here. We disagree, as *Strain* is distinguishable. Notably, the second question posed by the trial court in *Strain*, as the appellate court explained, was of a general nature and did not mention gangs. Conversely, here, in addition to asking the venire whether "anyone in your family or your friends [had] ever been negatively affected by street gangs," it also asked whether evidence concerning "those two topics, street gangs and street gun use" would "make[] you unfair to one side or the other?" Unlike the second question in *Strain*, the fairness question in this case expressly queried about gangs.

¶ 65 Defendant maintains that this query was nevertheless insufficient because "a person may find it completely fair to be biased against all street gang members." Defendant cites nothing in support of this extraordinary proposition, which, in our opinion, strains credulity. "Fair" and

"biased" are antonyms. Merriam-Webster Online Thesaurus, https://www.merriam-webster.com/thesaurus/biased (last visited October 23, 2024). "Bias" means "an inclination or temperament or outlook ***[;] such prepossession with some object or point of view that *the mind does not respond impartially* to anything related to this object or point of view." (Emphasis added.) Webster's Third New International Dictionary 211 (2002). Conversely, "fair" is defined as "marked by *impartiality*" (emphasis added.) (Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/fair (last visited October 23, 2024)) and "characterized by honesty and justice: free from fraud, injustice, *prejudice, or favoritism*" (emphasis added) (Webster's Third New International Dictionary 211 (2002)). These meanings are confirmed by their usage in our case law. See *People v. Moore*, 2023 IL App (1st) 211421, ¶ 115 (quoting *People v. Wiggins*, 2015 IL App (1st) 133033, ¶ 46 (quoting *People v. Marino*, 414 Ill. 445, 450 (1953))) ("The court, however, must conduct itself ' "in a fair and impartial manner, without showing bias or prejudice against either party." ' "; *People v. Encalado*, 2018 IL 122059, ¶ 24 (quoting *People v. Lobb*, 17 Ill. 2d 287, 300 (1959) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)) ("To secure this right [to an impartial jury], inquiry is permitted during *voir dire* ' "to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." ' "); *People v. Zehr*, 110 Ill. App. 3d 458, 461 (1982) ("Each of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury."); see also *People v. Montgomery*, 2023 IL App (3d) 200389, ¶ 28 ("A sentencing hearing is fundamentally unfair when the proceeding is affected by judicial bias."); *E & E Hauling, Inc. v. Pollution Control Bd.*, 116 Ill. App. 3d 586, 598 (1983) ("To decide whether the County Board proceedings were inherently unfair because of bias and prejudice, we must first decide how to characterize these proceedings."). Quite simply,

defendant's Orwellian assertion that some juror might find it "fair" to be "biased" flies in the face of the plain meaning of these terms. Hence, reasonable trial counsel could conclude that the trial court's question as to whether evidence pertaining to street gangs would cause a juror to be unfair adequately addressed the question of bias (we note that defense counsel did ask follow-up questions and ultimately excused two jurors who indicated they had prior involvement with (one through an earlier trial) street gangs). Therefore, defendant has not established that by failing to further pursue this subject during *voir dire*, counsel's conduct fell below an objective standard of reasonableness.

¶ 66    Having concluded that defendant has failed to satisfy the first prong of the *Strickland* analysis, we need not consider the second prong. *Johnson*, 2021 IL 126291, ¶ 53. Accordingly, defendant's claim that trial court provided ineffective assistance must fail.

¶ 67                                B. Sentencing

¶ 68    Defendant also argues that his sentence is excessive. Defendant was sentenced to a total of 75 years' imprisonment—50 years for first-degree murder plus a 25-year enhancement for discharging a firearm that proximately caused the victim's death. The sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-4.5-20(a) (West 2020). The statutorily authorized sentence for the enhancement is 25 years' imprisonment to natural-life. 730 ILCS 5/5-8-1(d)(iii) (West 2020). Thus, defendant could have been sentenced from anywhere between 45 years' imprisonment and natural life. Defendant asserts that his 75-year sentence is excessive in light of his rehabilitative potential, his purportedly nonviolent criminal history, the chaotic home life in which he was raised, his expression of remorse, his desire to be a productive citizen, and the fact that he has a "supportive and loving family." He points out that "he pursued and completed educational credits while in custody which demonstrated his desire and ability to improve his life."

He asserts that the sentence imposed fails "to fulfill the mandatory objective of restoring him to useful citizenship," and he asks that we reduce the sentence for murder to 20 years' imprisonment, which would result in an aggregate sentence of 45 years.

¶ 69    Generally, "[a] sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 198 Ill. 2d 48, 54 (1999) (citing *People v. Cabrera*, 116 Ill. 2d 474, 493-94 (1987)).   Our state constitution requires that sentences "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002); Ill. Const. 1970, art. 1, § 11. Thus, a sentencing court must balance "the retributive and rehabilitative purposes of punishment." *Id*. "The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors such as the lack of a prior record ***." *Id*.  A court must consider relevant mitigating evidence. *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010).

¶ 70    Because "the trial court is in a better position to consider, among other things, the credibility, demeanor, general moral character, mentality, social environment, habits and age of the defendant" (*Calhoun*, 404 Ill. App. 3d at 385), we will not disturb a sentence absent an abuse of discretion by the trial court (*People v. Watkins*, 2023 IL App (5th) 200322, ¶ 41).  An abuse of discretion occurs only where no reasonable person could agree with the position adopted by the trial court.  *People v. Farris*, 2012 IL App (3d) 100199, ¶ 26.  We may not substitute our judgment for the trial court or reverse a sentence simply because we would have weighed the pertinent evidence differently.  *Fern*, 189 Ill. 2d at 53.

¶ 71    Defendant first argues, "The sentencing court's decision to sentence [him] to serve 75 years in prison shows its failure to abide by the mandate from the Illinois Constitution and Illinois

Supreme Court that a court consider the rehabilitation of the defendant as one of its objectives at sentencing." See Ill. Const. 1970, art. 1, § 11. He asserts that his "50-year sentence *** is excessive because it completely removes any chance for rehabilitation or a return for useful citizenship despite there being obvious indicators showing [he] had potential for rehabilitation." However, the trial court expressly considered defendant's rehabilitative potential, stating, "I've considered the possibilities and probabilities of the defendant's rehabilitation, as well as the defendant's youth and its attendant circumstances." Moreover, while it is true that a court must consider a defendant's rehabilitative potential, it must do so in light of all relevant sentencing factors. *Watkins*, 2023 IL App (5th) 200322, ¶ 41. Further, "[n]ot *all* criminal defendants must be given an opportunity for rehabilitation or else life imprisonment would not be constitutionally permissible." (Emphasis in original.) *People v. Bien*, 277 Ill. App. 3d 744, 755-56 (1996). "A defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense." *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). Indeed, "[i]t offends justice to declare to crime victims and their families no 'reasonable' view of the record of their victimization would justify a life sentence for the person who has physically and emotionally brutalized them." *Bien*, 277 Ill. App. 3d at 756. We reject defendant's premise that his rehabilitative potential—whatever it may be—compels a lesser sentence. See *People v. Rickard*, 99 Ill. App. 3d 914, 919 (1981) ("We recognize that in other circumstances, the rehabilitation factor might not be entitled to as much weight.").

¶ 72    Defendant contends that "the minimum prison term of 20 years (45 with the mandatory firearm enhancement) would strike the proper balance between punishment and rehabilitation." The trial court balanced these factors. *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 21 ("The trial court has wide latitude to weigh the appropriate factors, which entitles it to deference.")

Defendant's contention is essentially a request that we reweigh these considerations. It is axiomatic that a "reviewing court may not reverse the sentencing court just because it may have weighed the relevant factors differently." *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20.

¶ 73    Moreover, the trial court articulated a reasoned basis for placing diminished weight on defendant's purported potential for rehabilitation. The trial court noted that shortly after the shooting, defendant became aware that he shot a bystander rather than another gang member. Nevertheless, in the approximate year between the shooting and the arrest[2], defendant continued to commit offenses. It is true that these intervening offenses were relatively minor (driving with a revoked license on multiple occasions and unlawful possession of medical marijuana); however, the trial court could reasonably infer that defendant's subsequent disregard for the law weighed negatively on his rehabilitative potential. *Cf. People v. Lusby*, 2020 IL 124046, ¶ 48 (In assessing the defendant's "prospects for rehabilitations, the court noted, "[W]hile [another inmate] and the defendant were both incarcerated, the defendant attacked him in a dispute over the telephone."); *People v. Boughton*, 2023 IL App (4th) 221029-U,¶ 47 ("[T]he commission of further felonies while one is in custody, awaiting trial, bodes ill for rehabilitation."). Similarly, that defendant accrued at least 10 incident reports while in jail awaiting trial provides further support for the trial court's conclusion. *People v. Suggs*, 2020 IL App (2d) 170632, ¶ 41 (Regarding the defendant's rehabilitative potential, the court observed, "Further, defendant was disciplined for numerous offenses at the jail while awaiting trial and sentencing."). In short, we cannot conclude that no

---

[2]Although defendant was taken into custody shortly after the offense occurred, he was apparently released, as the court file indicates an arrest warrant was issued approximately a year later on December 17, 2021.

reasonable person would agree with the trial court's conclusion on this issue; therefore, no abuse of discretion occurred. *Farris*, 2012 IL App (3d) 100199, ¶ 26.

¶ 74 Furthermore, we disagree with defendant's characterization of his criminal record as "nonviolent." Defendant had pending charges for aggravated battery stemming from an incident on September 15, 2019. Officer Young, who investigated the attack, described a video showing defendant punching and kicking the victim, who was on the ground. Moreover, defendant has two juvenile adjudications for battery. We further note that defendant was also convicted of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6 (West 2016)) occurring on July 6, 2017, which, while not violent *per se*, bears obvious relevance here. It is true that defendant has nine convictions of nonviolent offenses (which allow an inference regarding defendant's persistent disregard of the law), in addition to a myriad of pending cases. Thus, defendant is literally correct when he states, "[T]he fact is that the vast majority of [his] criminal history consisted of non-violent traffic related offenses." However, that defendant committed a large number of nonviolent offenses in no way mitigates the fact that by the time he murdered a person at the age of 22, he had already committed two batteries, had a third battery charge pending, and also had been convicted of a weapons offense. Defendant's criminal history is not nonviolent.

¶ 75 Defendant also points to his expression of remorse, which, he stated, the trial court acknowledged, during sentencing. It does not appear to us that the trial court found defendant's apology particularly credible: "Now, I put [the fact that defendant shot a bystander and his subsequent actions] up against [how] the defendant preached the sadness and sorrow in his statement." The trial court explained, "So what I saw and recited to the court here—or to the people here today is why that belays [sic] his statement in allocution." Of course, the trial court is the primary judge of credibility. *Calhoun*, 404 Ill. App. 3d at 385. Defendant has not established

that the trial court's assessment was erroneous.

¶ 76    It is true that there were some mitigating factors present in this case.  Defendant points out that "he was raised in a home where alcoholism and domestic abuse were present, he expressed remorse to the victim's family and shame for his failures, he has a supportive and loving family including two young children of his own, and he pursued and completed educational credits while in custody which demonstrated his desire and ability to improve his life."  We have already addressed the trial court's well-founded rejection of defendant's purported remorse and his desire to improve himself.  The trial court expressly delineated a number of the factors in aggravation and mitigation.  In mitigation (730 ILCS 5/5--3.2 (West 2020)), it found that the shooting was "induced or facilitated by someone other than the defendant." (730 ILCS 5/5-5-3.1(5) (West 2020)), while noting that the evidence of this was "vague" and "uncorroborated."  In aggravation (730 ILCS 5/5--3.2 (West 2020)), it noted defendant's history of delinquency and criminal activity and found that the sentence it imposed was necessary to deter others from committing a similar offense.  It found that defendant committed this crime "while he was on pretrial release" and that it was related to the activities of an organized gang.   The trial court did not mention defendant's home life as a factor in mitigation; however, it has been held that "evidence of a defendant's turbulent childhood is not inherently mitigating."  *People v. Hickey*, 204 Ill. 2d 585, 619 (2001). Furthermore, a trial court need not expressly articulate each and every factor upon which it relies. *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010) (holding that "the trial court does not need to expressly outline its reasoning for sentencing ***."); *People v. Ramos*, 353 Ill. App. 3d 133, 137-38 (2004) ("In addressing whether the trial court erred in failing to consider the defendant's background in imposing his sentence, we note that it is well established that a trial court 'need not articulate the process by which it determines the appropriateness of a given sentence.' ").

Balancing such factors is primarily a matter for the trial court. *People v. Garibay*, 366 Ill. App. 3d 1103, 1108 (2006). Defendant has not established that the manner in which the trial court did so here constituted an abuse of discretion. We therefore affirm defendant's sentence.

¶ 77

¶ 78                                    IV. CONCLUSION

¶ 79    In light of the foregoing, the judgment and sentence of the circuit court of Kane County is affirmed.

¶ 80    Affirmed.